UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                          :

STEPHEN DENG, RUOHONG JIANG, ANN     :
ZEMAITIS, MIGUEL SANTIAGO,         :    12 Civ. 7803 (DLC)
                                            :

                Plaintiffs,     :    <u>OPINION AND ORDER</u>
                                            :

        -v-                      :

278 GRAMERCY PARK GROUP, LLC; KAISH &  :
TAUB DEVELOPMENT LLC; GRAMERCY PARK    :
HOLDINGS LLC; GRAMERCY PARK LAND LLC;  :
BLACK MOUNTAIN DEVELOPMENT, LLC;      :
NORMAN KAISH,                     :

                Defendants.    :
                                            :
---------------------------------------X

APPEARANCES

For the Plaintiffs:

Kevin Kerveng Tung
136-20 38th Avenue, Suite 3D
Flushing, NY 11354


For Defendant Norman Kaish:

Norman Kaish, <u>pro se</u>
389 Plymouth Street
West Hempstead, NY 11552


DENISE COTE, District Judge:

    Plaintiffs Stephen Deng ("Deng"), Rouhong Jiang ("Jiang"),

Ann Zemaitis ("Zemaitis"), and Miguel Santiago ("Santiago") bring

this action against Norman Kaish ("Kaish") and related corporate

entities ("corporate defendants"), under Section 10(b) and Rule

10b-5 of the Securities Exchange Act of 1934 ("Exchange Act");

under Sections 12(a)(2), 15, and 17 of the Securities Act of 1933 ("Securities Act"); under Rule 506 of Regulation D of the Securities Act; and under various common law theories.  The corporate defendants defaulted, and the claims against them were referred for an inquest on damages.  Plaintiffs have now moved for partial summary judgment against Kaish on the Section 10(b) and Rule 10b-5 claim only.  For the reasons explained below, plaintiffs' partial summary judgment motion is granted.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to the non-moving party, here the defendant.  The plaintiffs consist of two couples who invested in a Manhattan real estate development project ("Project") at different times. The first couple, Zemaitis and Santiago, invested in 2006.  The second couple, Deng and Jiang, invested in 2008.

The Project was organized by defendant Kaish and Leonard Taub ("Taub").  The corporate defendants consist largely of corporate entities formed by Kaish and Taub to execute the Project.  In July 2006, the Project issued a Private Placement Memorandum ("PPM").  As relevant here, the PPM lays out the following description of the Project:

- The Project intends to purchase a piece of land in the Gramercy neighborhood of Manhattan, New York, in order to develop residential condominiums, exclusive triplex

2

residences, and commercial space.

- The PPM offers Class B shares in the Project, at a price of $110,000 per unit, and constituting 1/200 membership interest in the Project.

- The cost of the Project will be approximately $94.1 million, which includes purchasing the land, the air rights, construction costs, and other costs and expenses.

- "$11 million of the project cost will be covered by the equity raised through this offering."

- The remaining costs will be covered by a mezzanine loan and a construction loan, in the amount of $14.6 and $70.6 million respectively.

- "The Company believes it can rapidly obtain preliminary approval for a construction loan with a lien on the Property from commercial Banks (the 'Lender') in the amount of $70.6 million (the 'Loan')."

- The Development Group is entitled to an aggregate fee of 5% of the total cost of the Project.

The PPM also sets forth many risk factors, the most relevant of which are as follows:

- These securities "involve a high degree of risk, and should not be purchased by anyone who cannot afford a complete loss" of investment.

- "The Company requires substantial amounts of construction financing from banks to implement and complete the Project. The Company cannot be certain that such external financing will be available on favorable terms, or at all."

- "The availability and terms upon which financing of the Project may be obtained are material to the Company's operations and there can be no certainty that such financing, if available, will be on acceptable terms to the Company."

- "Changes in national economic conditions . . . may have a

3

material adverse impact on the Company's results of
operations or financial condition."

- "The net proceeds of this Offering will be used for, among
  other things, establishing sufficient working capital to
  obtain a construction loan and commence full-scale
  operations as well as other general corporate purposes.  The
  Company's Manager will have broad discretion as to how to
  apply the net proceeds of this Offering as well as complete
  discretion as to the application of day-to-day management of
  the Company and the Project."

In August 2006, the Project purchased the land for
approximately $17 million.  The Project did so with a mortgage of
$30.5 million from UBS Real Estate Investments, Inc. ("UBS").
The Project later used the remaining funds to purchase the air
rights.

On or around August 2006, Zemaitis and Santiago learned of
the Project.  Taub called Zemaitis to advise her that the Project
had room for investors and expected an 83.5% rate of return.
Zemaitis and Santiago reviewed the PPM, which led them to believe
that their investment would be used for the Project's costs.

In November 2006, Zemaitis and Santiago agreed to become
investors in the Project, and signed the Subscription Agreement
and Investor Questionnaire.  They purchased $880,000 worth of
Class B Securities in the Project.

On Tuesday, November 14, the $880,000 was deposited in the
Project's bank account.  Within three days, i.e., by Friday,
November 17, virtually all of these funds had been withdrawn from
the account.  The intervening transactions consisted almost

entirely of transfers from the Project to other corporate entities formed by Kaish or Taub.

In July 2007, UBS forwarded to the Project a loan application for construction financing up to $82 million and mezzanine funding in the amount of $11 million.  The Project did not pursue any opportunities to obtain construction and mezzanine financing from other sources.  At or around the same time, the Project obtained an increase from UBS of the August 2006 mortgage to $34 million, and the maturity date was extended such that the balance was due and payable in full on August 2008.

In March 2008, Deng and Jiang learned of the Project.  They were sent a document summarizing the Project details ("Project Summary").  The Project Summary is much shorter than the PPM, but it shares basic similarities: it describes the Project and its purpose; it describes the costs of the Project; and it sets forth that the proceeds raised in the equity offering would be used towards those costs, although these costs are somewhat higher than those reported in the PPM.

Significantly for present purposes, the Project Summary states (as did the PPM) that the "Company believes it can rapidly obtain preliminary approval for a construction loan with a lien on the Property from commercial Banks (the 'Lender') in the amount of $76 million (the 'Loan')."  The Project Summary further states that investors can expect a rate of return of 83.5% and

their invested capital returned within two and a half years.  The
Project Summary lacks the lengthy risk factors discussion set
forth in the PPM.  The Project Summary led Deng and Jiang to
believe that, given the rapid approval of the construction loan,
the Project was likely to achieve the 83.5% rate of return.

On or around the end of March, Deng and Jiang agreed to
become investors in the Project, and signed the Subscription
Agreement and Investor Questionnaire.  They purchased $330,000
worth of Class B Securities in the Project.

On August 2008, the Project defaulted on the mortgage with
UBS.  In March 2009, UBS commenced a foreclosure proceeding in
New York state court against various corporate entities and Kaish
and Taub, who were both guarantors of the mortgage.  In March
2010, summary judgment was granted to UBS.

Of relevance here is a particular issue that arose in the
foreclosure proceedings.  In their answer, Kaish and Taub, who
were represented by counsel in the foreclosure proceedings,
asserted an affirmative defense and counterclaim alleging that
UBS committed fraud upon them.  They alleged that UBS represented
that it would approve the construction and mezzanine loan, that
this representation was false, that UBS knew it was false when
made, and that they reasonably relied upon this representation.
As damages, they contended that, as a result of UBS's
representations, Kaish lost the opportunity to obtain such

financing from other sources, leading to the eventual
foreclosure.

In a December 2009 ruling, the New York court struck this
affirmative defense.  As relevant here, it found that, because of
the many clear statements in the evidence demonstrating that UBS
made no commitment to approve the construction and mezzanine
loan, the defendants "could not have reasonably relied upon any
purported representations that the loan would be approved."
Furthermore, the New York court discussed documentary evidence
showing that the defendants "were aware that they needed to close
the construction loan as soon as possible, because something
negative could happen in the condominium market, the lender could
pull out, and they would have no loan."

Between August 2008 and February 2011, the Project sent
multiple letters to the plaintiffs.  These letters acknowledged
the foreclosure proceedings and other financial challenges but
provided reassurances regarding the Project's prospects.  It was
not until March 2011 that the Project informed the investors that
their investment had been wiped out.

On October 18, 2012, plaintiffs brought the present action
against these defendants, naming Taub as well as a defendant.  On
July 12, 2013, default was entered against the corporate
defendants, and an inquest into damages was referred to the
Honorable James L. Cott.  On July 30, Taub was voluntarily

dismissed, leaving only Kaish, who is proceeding pro se.

On March 19, 2014,[1] plaintiffs moved for partial summary judgment on the Section 10(b) and Rule 10b-5 claim.  Kaish filed an opposition with certain exhibits, and the motion was fully submitted as of April 16.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must

---

[1] On March 14, 2014, Magistrate Judge Cott issued a Report & Recommendation ("R&R"), recommending that a default judgment be entered against the principal corporate defendant in the amount of $880,000 with respect to Zemaitis and Santiago, and in the amount of $333,000 with respect to Deng and Jiang, as well as prejudgment interest, post-judgment interest, attorney's fees, and costs.  No objections were made to the R&R within the allotted time.

"set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor may a party "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

    In considering the summary judgment motion, a court liberally construes all submissions by the pro se defendant and "interpret[s] [them] to raise the strongest arguments that they suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).  The application of this forgiving standard for pro se litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

    Plaintiffs contend that Kaish violated Section 10(b) and

Rule 10b-5 of the Exchange Act.  Rule 10b-5 makes it unlawful to
"make any untrue statement of a material fact or to omit to state
a material fact necessary in order to make the statements made,
in light of the circumstances under which they were made, not
misleading."  17 C.F.R. § 240.10b-5(b); see also 15 U.S.C.
§ 78j(b).  To succeed on a claim brought under Section 10b, a
plaintiff must therefore show (1) a material misrepresentation or
omission, (2) scienter, (3) a connection with the purchase or
sale of a security, (4) reliance, (5) economic loss, and (6) loss
causation.  Carpenters Pension Trust Fund of St. Louis v.
Barclays PLC, No. 13-2678, ___ F.3d ___, 2014 WL 1645611, at *3-
*4 (2d Cir. Apr. 25, 2014) (citing Dura Pharm. Inc. v. Broudo,
544 U.S. 336, 341-42 (2005)).

> To be "material" within the meaning of [Section] 10(b),
> the alleged misstatement must be sufficiently specific
> for an investor to reasonably rely on that statement as
> a guarantee of some concrete fact or outcome which,
> when it proves false or does not occur, forms the basis
> for a [Section] 10(b) fraud claim.

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, No.
12-4355, ___ F.3d ___, 2014 WL 1778041, at *6 (2d Cir. May 6,
2014).

Although plaintiffs allege a variety of fraudulent
statements, only two merit discussion here.  As to the
Zemaitis/Santiago couple ("Zemaitis/Santiago"), the alleged
fraudulent statement is that the couple's investment would be

used to fund the Project's costs.  As to the Deng/Jiang couple ("Deng/Jiang"), the alleged fraudulent statement is that the Project anticipated "rapid[]" approval of a construction and mezzanine loan.  Each is addressed in turn.

A. Zemaitis/Santiago: Use of Proceeds

Zemaitis/Santiago allege that the statement in the PPM -- that the equity proceeds would be used towards that Project's costs -- was an untrue statement of material fact.  Specifically, Zemaitis/Santiago point to the transaction data, showing that their investment was quickly and almost entirely transferred to corporate entities controlled by Kaish.  This evidence is sufficient to meet the moving party's burden of establishing the absence of a material factual question as to the existence of a misrepresentation, its materiality, scienter, reliance, and the other elements of a Rule 10b-5 claim.  Thus, the burden shifts to Kaish to raise a genuine question of material fact as to any element of the claim.  He has failed to do so.

Kaish makes three arguments.  First, he contends that there was no misrepresentation, as these funds were legitimately taken by the developers as fees.  The PPM provides that the developers earn fees totaling 5% of the Project costs.  As Kaish explains it, coincident with the Zemaitis/Santiago investment, the developers decided to take their permitted fees.  Taub advised

11

the company bookkeeper to move this money from the Project's bank account to the developers' account and to then make certain transfers to the unrelated corporate entities.  Kaish contends the bookkeeper erred in making the transactions directly from the Project's bank account to the accounts for the corporate entities.  Thus, Kaish argues that the investor funds were used for the Project in the form of legitimate developer fees.

This argument fails to raise a genuine question of material fact because Kaish submits insufficient evidence to support his assertions.[2]  He provides no document or log demonstrating the accrual of his developer fees, which would show that he was owed such fees at the approximate time of the Zemaitis/Santiago investment and in what amount.  Additionally, he provides no affidavit or statement by Taub or the bookkeeper to corroborate Kaish's account of their conduct.  As such, Kaish's argument is precisely the sort of conclusory, self-serving argument that is insufficient to defeat summary judgment, even for a pro se party.

Second, Kaish appears to challenge the existence of loss causation.  In the context of securities fraud litigation, "[l]oss causation is the causal link between the alleged

---

[2] Kaish states that "a full set of check registers has been provided to the Plaintiffs and provided to the Court."  The Court is unaware of any such submission, and it was not one of three exhibits to Kaish's opposition.  To the extent that Kaish is referring to the transaction data in plaintiffs' exhibits, it does not support his assertion.

misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted).  Loss causation is akin to the tort law concept of proximate cause, "i.e., that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission. . . ." Id. at 172 (citation omitted).  Kaish argues that, even had the developers taken no fees, the financial crisis prevented any bank from lending to the Project, thus dooming the Project in any event.

This argument also fails.  To begin, this claim is entirely unsupported by evidence that no bank would have loaned funds to the Project even if it were properly using its invested funds. More importantly, the failure of the Project in 2008 and the loss of the entirety of plaintiffs' investment in 2006 are two separate events.  Kaish has not shown that the plaintiffs' invested funds would have been lost in the Project's collapse even if they had remained in the Project's accounts and had not been diverted years earlier.  The proximate cause of the loss of plaintiffs' funds was the diversion of those funds in 2006, within days of the investment.  The collapse of the Project in 2008 cannot serve as the proximate cause for the 2006 loss.

Third, Kaish's opposition generally places heavy reliance on the risk disclosures in the PPM.  In particular, he points to the statement that the company's manager has "complete discretion" on

13

how to apply the net proceeds of the offering.

This argument too fails.  In particular, the relied upon statement is immediately preceded by a sentence stating that the investor proceeds would be used on the Project.  Thus, the relied-upon statement does not warn of the risk that the Project would use the funds for non-Project purposes, as here.  Moreover, it is well-established in this Circuit that the disclosure of risk factors or analogous cautionary language must be specific to the alleged misrepresentation insulate the defendant from liability.  See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004); Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998); cf., e.g., In re ProShares Trust Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013); Panther Partners Inc. v. Ikanos Comm's, Inc., 681 F.3d 114, 122 (2d Cir. 2012); Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 130-31 (2d Cir. 2011); Slayton v. Am. Exp. Co, 604 F.3d 758, 772 (2d Cir. 2010).  As no risk factor specifically warns that the Project may divert the invested funds, the generic risk factors discussion included in the PPM is insufficient to defeat summary judgment.

B. Deng/Jiang: "Rapid[]" Approval of Loan

Deng/Jiang allege that the statement in the Project Summary -- that the Project anticipated "rapid[]" approval of a

construction and mezzanine loan as of March 2008 -- was an untrue statement of material fact.  "Statements that are opinions or predictions are not <u>per se</u> inactionable under the securities laws.  Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 . . . if the speaker does not genuinely or reasonably believe them."  <u>In re Int'l Bus. Machines Corporate Sec. Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

Deng/Jiang's evidence is sufficient to meet their burden in moving for summary judgment.  Specifically, the evidence on which the state court foreclosure decision relied establishes that, to the extent that Kaish believed that he could acquire rapid loan financing in March 2008, that belief was unreasonable.  At the time he made the statement, the loan application that Kaish had submitted to UBS almost nine months earlier had not been approved.  He presents no basis to reasonably believe in March 2008 that any loan would be "rapidly" given.  Moreover, the application documents contained no commitment from UBS, and Kaish admits that he had not explored other financing opportunities. Additionally, the state court noted documentary evidence establishing that Kaish was aware that the loan was critical to the Project's success.  This evidence is sufficient to establish the absence of a material factual question as to the existence of a misrepresentation, its materiality, scienter, reliance, and the

15

other elements of a Rule 10b-5 claim.  Thus, the burden shifts to
Kaish to raise a genuine question of material fact as to any
element of the claim.  He has again failed to do so.

Kaish offers three principal responses.  First, Kaish
disputes reliance on the state foreclosure proceeding.  He
contends that the foreclosure decision was merely a ruling on the
availability of his affirmative defense and counterclaim.  To the
extent that Kaish is disputing the preclusive effect of the state
court proceeding, this fails.  The moving party does not need the
state court proceeding to be preclusive.  The plaintiffs need
only rely on the admissible evidence that informed that court's
decision; they have done so here.  In any event, the elements of
issue preclusion under New York law are met here.  See City of
New York v. Welsbach Elec. Corp., 878 N.E.2d 966, 968 (N.Y. 2007)
(Under New York law, issue preclusion will apply "if the issue in
the second action is identical to an issue which was raised,
necessarily decided and material in the first action, and the
plaintiff had a full and fair opportunity to litigate the issue
in the earlier action." (citation omitted)).

Second, Kaish states that it was reasonable for him to not
pursue other financing options because UBS had told him that it
wanted to lend to the Project.  While reliance on such a
statement may have been reasonable for some period of time, it
was no longer reasonable nine months after the application had

been submitted to UBS, and UBS had failed to act on it.
Moreover, this is precisely the argument that was rejected in the
state court proceeding.

Relatedly, Kaish points to a March 2008 letter from Corus
Bank setting forth some proposed terms and conditions under which
it might grant a loan to the Project.  This document, upon close
review, is materially identical to the UBS loan application.  It
contains the same cautionary language not to view its loan terms
as a "commitment."  Thus, Kaish's reliance on the Corus Bank
document does not raise a genuine question of material fact that
Kaish had a reasonable basis to believe in March 2008 that a loan
would be "rapidly" extended to the Project.

Third, Kaish makes a number of assertions to suggest that he
was not perpetrating a fraud but actually engaged in a legitimate
business venture that happened to fail.  He describes the Project
as carefully thought out; he notes that the Project acquired
permits; and he asserts that the buyer after the foreclosure has
proven successful in the same residential development venture.
He also insists that the Project tried to acquire alternate
financing after the default.  Finally, he observes that he and
Taub had an opportunity to walk away from the Project but did not
do so, resulting in a large judgment against them in the
foreclosure proceeding.  These actions, Kaish asserts, are
inconsistent with one perpetrating a fraud.

17

These generalized arguments about Kaish's belief in the
Project's merits are insufficient to defeat summary judgment.  A
defendant's expectations for an investment, no matter how
genuine, do not excuse an intentional material misrepresentation
in connection with the sale of securities.  As such, these
arguments do not raise a genuine question of material fact as to
any of the elements of plaintiffs' Rule 10b-5 claim.


CONCLUSION

Plaintiffs' March 19, 2014 summary judgment motion is
granted.  A concurrently filed Order will set forth a schedule
for briefing summary judgment as to damages.


   SO ORDERED:

Dated:    New York, New York
          May 30, 2014

                              _____
                                        DENISE COTE
                              United States District Judge

COPIES MAILED TO:


Norman Kaish
389 Plymouth Street
West Hempstead, NY 11552